# Exhibit A

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made as of September 19, 2022 (the "Effective Date") by and between Keeco, LLC (the "Employer" or the "Company"), and Chris Grassi ("Executive"). Certain definitions are set forth in Section 7 of this Agreement.

WHEREAS, Employer desires to employ Executive, and to do so on the terms and conditions set forth herein; and

WHEREAS, Executive is willing to accept such employment on such terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.    **Employment.** Employer agrees to employ Executive, and Executive accepts such employment with Employer, upon the terms and conditions set forth in this Agreement from and after the date hereof through the period ending upon the Termination Date pursuant to Section 4(a) hereof (the "Employment Period").

2.    **Position and Duties.** During the Employment Period, Executive shall serve as the Chief Executive Officer of Employer and shall have the normal duties, responsibilities and functions implied by such position, and any other additional duties as reasonably directed by the Board of Directors of Employer (the "Board") and consistent with Executive's position. Executive shall report to the Board and shall devote his best efforts and full business time and attention to the business and affairs of Employer, except for approved vacation periods in accordance with Employer's standard policies, periods of illness or other incapacity, or as otherwise agreed to by the Board or as otherwise set forth in Section 2(a) below.

(a)    Executive shall perform his duties, responsibilities and functions to Employer hereunder to the best of his abilities and in a diligent, trustworthy, professional and efficient manner and shall comply with Employer's reasonable business-related policies and procedures. In performing Executive's duties and exercising his authority under the Agreement, Executive shall support and implement the business and strategic plans approved from time to time by the Board in consultation with Executive and shall support and cooperate with Employer in its efforts to expand its businesses and operate profitably and in conformity with the business and strategic plans approved by the Board in consultation with Executive. Subject to Executive's obligations under Section 6 hereof and the Company's ethics policies, Executive may manage his personal investments, serve on civic or charitable boards or engage in civic or charitable activities, and, with the consent of the Board (which shall not be unreasonably withheld, conditioned or delayed) participate on boards of other for-profit companies and engage in other business activities, including consulting activities, provided that such activities, individually or in the aggregate do not materially interfere with Executive's performance of his duties hereunder. For the avoidance of doubt, nothing herein shall prohibit Executive from continuing to own and receive revenue from Grassi and Associates so long as (i) Executive does not devote material time to such enterprise, (ii) Executive does not provide services that are competitive with the services provided by

1

Employer or its Subsidiaries, and (iii) Grassi and Associates does not provide services to the Company's Subsidiaries or to any material vendor to the Company or its Subsidiaries; provided that, if Grassi and Associates begins to provide services that are competitive with the services provided by Employer or its Subsidiaries, or begins to provide services to the Company's Subsidiaries or to any material vendor to the Company or its Subsidiaries, then Executive shall have a period of not less than 120 days after the provision of such services begins to divest his entire interest in Grassi and Associates and, so long as Executive divests his entire interest in Grassi and Associates prior to the expiration of such 120 day period, then Executive shall not be deemed to be in breach of any provision hereof as a result of such ownership or receipt of revenue.

(b)    Executive shall perform his duties and responsibilities hereunder principally at the Company's corporate headquarters, which currently is located in New York, New York; provided that Executive may be required under reasonable business circumstances and at the Company's expense to travel outside of such location in connection with performing his duties under this Agreement.

3.    **Compensation and Benefits.**

(a)    Salary. During the Employment Period, Employer will pay Executive a base salary (the "Annual Base Salary") of $1,250,000 per annum or such higher amount as may be determined by the Board. The Annual Base Salary shall be payable by Employer in regular installments in accordance with Employer's general payroll practices in effect from time to time but no less frequently than monthly. During the Employment Period, the Annual Base Salary shall be reviewed by the Board or a committee thereof at such time as the salaries of other senior executives of the Company are reviewed generally, but no less frequently than once a year. The Annual Base Salary shall not be reduced without the prior written consent of Executive. If so increased or reduced, then such adjusted salary will thereafter be the Annual Base Salary for all purposes under this Agreement.

(b)    Annual Incentives. In addition to the Sixty Thousand Dollar ($60,000) annual bonus described in Section 3(d) below, for each fiscal year during the Employment Period commencing with the 2022 fiscal year, Executive shall be eligible to participate in an annual bonus plan under terms and conditions no less favorable than other senior executives of the Company; provided that Executive's target annual bonus opportunity shall be fifty percent (50%) of Executive's Annual Base Salary. Executive's payment under the annual bonus plan (the "Annual Bonus") shall be based on the extent to which performance objectives established by the Board or a committee thereof in consultation with Executive have been achieved. Unless a different payment date is established in the applicable bonus plan by the Board, payment of the Annual Bonus shall be made in a single lump sum within 10 calendar days after receipt by the Company of audited financial statements following the end of the Company's fiscal year (which audited financial statements the Company shall diligently seek to request and obtain). Executive must be employed, in good standing as of the date of payment to be eligible to receive payment of any Annual Bonus for a given fiscal year, subject to Sections 4(b) and (c) below. Nothing contained in this Section 3(b) will guarantee Executive any specific amount of bonus compensation. For the

avoidance of doubt, payments under the Annual Base Salary shall be prorated based on the Effective Date.

(c)    Stock Option. Within 90 calendar days after the Effective Date, Executive shall be granted an option (the "Stock Option") to purchase common shares of the Company (with the specific allocation of a 10.2% fully diluted option pool among Executive and his management team to be determined by the Board in consultation with Executive after the Effective Date) on and subject to the terms of an equity incentive plan maintained by the Company (the "Equity Plan") and an award agreement to be executed by Executive (it being understood that such grant shall be conditioned upon the execution of such award agreement). The Stock Option shall have an exercise price per share equal to the "Fair Market Value" (as defined in the Equity Plan) of the underlying option shares on the date of grant, which Executive and the Company both agree is equal to $547.40 per Share. Subject to the immediately succeeding sentence, the Stock Option shall vest in installments and become exercisable as follows: (i) fifty percent (50%) of the Stock Option shall be subject to a time-based vesting schedule over 7 years, with one-seventh of the option shares vesting on the first anniversary of the date of grant and the remainder vesting in equal quarterly installments over the following 6 years (subject to acceleration upon a Change in Control of the Company, as defined in the Equity Plan), and (ii) the other fifty percent (50%) of the Stock Option shall be subject to a performance-based vesting schedule, with all of that performance-based Stock Option vesting based on the Centre Lane Funds attaining a 2.0x multiple of invested capital, provided that, in each case, Executive remains employed through the applicable vesting date. A portion of the Stock Option equal to 0.2% of the fully diluted option pool granted to the Executive (in addition to the Stock referenced in the immediately preceding sentence) shall only be subject to the time-based vesting restrictions referred to in clause (i) of the immediately preceding sentence. By way of illustration, if the Execution receives an allocation of 3.2% of the fully diluted pool, then 1.7% shall be subject to time vesting (1.5% plus 0.2%) and 1.5% shall be subject to performance vesting. During the Employment Period, the Company and its affiliates may, but shall have no obligation to, grant additional equity compensation awards to Executive under this Agreement or under the Equity Plan.

(d)    Loan. As soon as reasonably practicable after the date hereof, and provided that the Company is able to obtain the requisite consent of any of its lenders, the Company shall grant to Executive a loan (the "Loan") in the principal amount of $2,000,000 as an employee benefit, which shall be delivered to Executive by wire transfer of immediately available funds to an account designated by Executive to Employer in writing. The amount of outstanding principal under the Loan shall bear interest at a rate of 3 percent per annum, and interest shall accrue on the principal balance from and after the date hereof and shall be calculated on the basis of a 365-day year. Interest shall be payable annually, and the Company shall pay to Executive an annual bonus of Sixty Thousand Dollars ($60,000) per year in order for Executive to pay such interest. The amount of the outstanding principal of the loan and all interest accrued thereon shall be due upon the earlier of (i) 60 days following a Liquidation Event, and (ii) the 7th anniversary of the date hereof. Executive, as security for his obligations to pay when due all principal and interest that Executive owes to Employer under the Loan, hereby grants to Employer a security interest in Executive's entire right, title and interest in and to the equity interests in Employer held by Executive (directly

or through Executive's interest in CG Holdco, LLC), which security interest shall automatically be released, without any further action by any person or entity, upon payment in full to Employer of all principal and interest that Executive owes to Employer under the Loan.

(e)     Other Benefits. Executive will be entitled to such other benefits in accordance with Employer's standard policies and procedures approved by the Board and made available to the senior management of Employer generally, except that the Company shall cover one-hundred percent (100%) of the cost of Executive's health coverage for Executive and his eligible dependents; provided that (i) if the Company determines in its sole discretion that it (A) cannot provide such coverage without violating applicable law (including, without limitation, Section 2716 of the Public Health Service Act), or (B) will change to a self-insured group health plan, the Company (or its Affiliate) may immediately cease to provide no-cost group health coverage to Executive and, if applicable, his eligible dependents, and (ii) the Company may, at any time and in its sole discretion, increase Executive's taxable compensation in an amount equal to the monthly premium that Executive would be required to pay to continue Executive's then-current group health coverage. Employer shall reimburse Executive for any and all reasonable costs and out-of-pocket expenses incurred by Executive in connection with the performance of Executive's duties under this Agreement, subject to and in accordance with Employer's standard policies (including, without limitation, expense documentation and verification policies) regarding the reimbursement of business expenses, as the same may be modified from time to time.

4.     **Termination; At Will Employment.**

(a)     Termination of Employment Period. Executive's employment is "at will", which means that Executive may resign at any time and Employer may terminate Executive's employment at any time, with or without Cause; provided that Executive may terminate the Employment Period without Good Reason and the Company may terminate the Employment Period without Cause only by giving written notice at least 30 days in advance of the intended termination date. In addition, the Employment Period shall terminate automatically and immediately upon Executive's Disability or death (the date the Employment Period ends or terminates for any reason, the "Termination Date").

(b)     Severance. If Executive's employment is terminated by Employer without Cause or by Executive for Good Reason, Executive shall be entitled to receive, as special severance, (i) Executive's then Annual Base Salary during the period commencing on the date of such termination and ending on the date which is twelve (12) months after the date of such termination (the "Severance Period"), payable in regular installments on Employer's regular salary payment dates in conformity with Employer's customary payroll practice as in effect on the date of termination, but in no event less than monthly; (ii) the prior year's Annual Bonus, if not yet paid, payable at the same time that bonuses are paid to other senior executives of the Company for such year (the "Prior Year Bonus"); and (iii) a prorated portion of the Annual Bonus for the year in which the Termination Date occurs, based on actual performance results, payable at the same time that bonuses are paid to other senior executives of the Company for such year (the "Pro Rata Bonus"). If the preceding sentence applies, Executive also shall be entitled, during the Severance Period, to participate in the medical benefit plan in which Executive participated prior to such

termination to the extent permitted by the provider of such plan and at no cost and expense incurred by Executive prior to such termination or, to the extent such participation is not permitted by the provider of such plan, if Executive is eligible for and timely elects continued health insurance coverage in accordance with COBRA, then Employer will pay the cost of any COBRA premiums during the Severance Period. Notwithstanding anything to the contrary herein, (x) Executive shall not be entitled to receive any payments or benefits pursuant to this Section 4(b) (and Executive shall forfeit all rights to such payments and benefits) unless Executive has executed and delivered to Employer a general release in favor of Employer and its Affiliates in substantially the form attached hereto as **Exhibit A**, with such changes as Employer, after consulting with Executive or Executive's legal representative, may determine to be required or reasonably advisable in order to make the release enforceable and otherwise compliant with applicable law (the "General Release"), and such General Release remains in full force and effect, has not been revoked and is no longer subject to revocation, within 60 days of the Termination Date, and (y) Executive shall be entitled to receive such payments and benefits pursuant to this Section 4(b) only so long as Executive has not breached any of the provisions of the General Release or Sections 5 or 6 hereof. The General Release shall contain customary language releasing any claims Executive has or may have on behalf of himself and his spouse, heirs, successors and assigns.

(c)     Payments upon Death or Disability. If the Employment Period ends as a result of Executive's death or Disability, Executive or Executive's estate, as applicable, shall be entitled to the Prior Year Bonus and the Pro Rata Bonus, payable at the time that bonuses are paid to other senior executives of the Company for the applicable year, provided that Executive or Executive's legal representative has executed and delivered to Employer a General Release and such general Release has become effective and enforceable in accordance with its terms.

(d)     Offset. In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement.

(e)     Code Section 409A. Any amounts payable pursuant to Section 4 (other than the Earned Benefits (as defined below)) shall not be paid until the first scheduled payment date following the date the General Release is executed and no longer subject to revocation, with the first such payment being in an amount equal to the total amount to which Executive would otherwise have been entitled during the period following the date of termination if such deferral had not been required: provided, that any such amounts that constitute nonqualified deferred compensation within the meaning of Internal Revenue Code (the "Code") Section 409A and the regulations and guidance promulgated thereunder (collectively, "Section 409A") shall not be paid until the 60th day following such termination to the extent necessary to avoid adverse tax consequences under Section 409A, and, if such payments are required to be so deferred, the first payment shall be in an amount equal to the total amount to which Executive would otherwise have been entitled during the period following the date of termination if such deferral had not been required; provided, further that, if Executive is a "specified employee" within the meaning of Section 409A, any amounts payable to Executive under this Section 4 during the first six months and one day following the date of termination pursuant to this Section 4 that constitute nonqualified

deferred compensation within the meaning of Section 409A shall not be paid until the date that is six months and one day following such termination to the extent necessary to avoid adverse tax consequences under Section 409A, and, if such payments are required to be so deferred, the first payment shall be in an amount equal to the total amount to which Executive would otherwise have been entitled during the period following the date of termination if such deferral had not been required. Any reimbursements by Employer to Executive of any eligible expenses under this Agreement that are not excludable from Executive's income for Federal income tax purposes (the "Taxable Reimbursements") shall be made by no later than the last day of the taxable year of Executive following the year in which the applicable expenses were incurred. The amount of any Taxable Reimbursements, and the value of any in-kind benefits to be provided to Executive, during any taxable year of Executive shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year of Executive. The right to Taxable Reimbursements, or in-kind benefits, shall not be subject to liquidation or exchange for another benefit. Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company. In the event the payment period under this Agreement for any nonqualified deferred compensation commences in one calendar year and ends in a second calendar year, the payments shall not be paid (or installments commenced) until the later of the first payroll date of the second calendar year, or the date that the General Release becomes effective and irrevocable, to the extent necessary to comply with Section 409A. For purposes of Section 409A, Executive's right to receive any "installment" payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

(f)    Earned Benefits. If Employer terminates Executive's employment for any reason at any time, or if Executive resigns for any reason at any time, then Executive shall receive all earned but unpaid salary and benefits, including, without limitation, any accrued but unpaid vacation pay or paid time off amounts, and any unreimbursed business expenses (collectively, the "Earned Benefits").

(g)    No Other Benefits. Except as otherwise expressly provided in this Agreement or any other written agreement between Executive and Employer, Executive shall not be entitled to any other salary, bonuses, employee benefits or compensation from Employer after the termination of the Employment Period other than those expressly required under applicable law (such as COBRA).

5.    **Confidential Information.**

(a)    Executive acknowledges that Employer operates in a highly competitive industry and that its success depends in part on protecting the confidentiality of certain confidential information of Employer and its Affiliates, including as specified in this Section 5. As such, Employer has and will continue to develop, compile and own certain Confidential Information that has great value in its businesses. Executive acknowledges that Employer takes reasonable steps to protect the confidentiality of its Confidential Information, including limiting access to Confidential Information and having its employees with access to Confidential Information sign confidentiality agreements. Executive will not at any time (whether during or after the Employment Period) (i)

retain or use for the benefit, purposes or account of Executive or any other Person (other than Employer), or (ii) disclose, divulge, reveal, communicate, share, transfer or provide access to any Person outside Employer (other than Employer's professional advisers or other Persons who are bound by confidentiality obligations with Employer), any Confidential Information.

(b)    Employer's "Confidential Information" means: (i) the identity of contacts at customers; (ii) customer prospects, corporate business structure and business units; (iii) customer-specific information, including customer confidential information and customer use scenarios; (iv) product road maps and future releases; (v) research projects and planned products; (vi) third party code and other proprietary information technology; (vii) acquisition plans, targets, documents and strategies; and (viii) financial, operational and other non-public information about Employer and its Subsidiaries. For purposes of this Section 5, "Confidential Information" shall not include any information that is: (i) generally known to the industry or the public, other than as a result of Executive's breach of this Agreement or any breach of other confidentiality obligations to Employer by third parties of which Executive is aware; (ii) made legitimately available to Executive by a third party without breach of any confidentiality obligation known to Executive; or (iii) required by law to be disclosed; provided that Executive shall, to the extent legally permitted to do so, give prompt written notice to Employer of such requirement, disclose no more information than is required and cooperate with any attempts by Employer to obtain a protective order or similar treatment (at the sole cost of Employer).

(c)    Upon termination of the Employment Period for any reason, Executive shall: (i) cease and not thereafter commence use of any Confidential Information (including, without limitation, any patent, invention, copyright, trade secret, trademark, trade name, logo, domain name or other source indicator) owned or used by Employer; (ii) immediately destroy, delete or return to Employer, at Employer's option, all originals and copies in any form or medium (including memoranda, books, papers, plans, computer files, letters and other data) in Executive's possession or control (including any of the foregoing stored or located in Executive's office, home, laptop or other computer, whether or not Employer property) that contain Confidential Information or otherwise relate to the business of Employer; and (iii) notify and fully cooperate with Employer regarding the delivery or destruction of any other Confidential Information in Executive's possession or control. For the avoidance of doubt, the provisions of this Section 5 are in addition to, and not in lieu of, any other confidentiality obligations, or other protective covenants, to which Executive may be subject. Notwithstanding the foregoing, upon any termination of the Employment Period, Executive may retain a copy of his contacts (in written and/or electronic form).

(d)    Executive acknowledges that all inventions, innovations, improvements, developments, methods, processes, programs, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any Confidential Information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) that relate to Employer's or any Affiliate of Employer's actual or anticipated business (as to which significant use of corporate resources has occurred), research and development, or then existing products or services and that

are conceived, developed, contributed to, made or reduced to practice by Executive (either solely or jointly with others) while employed by Employer (including any of the foregoing that constitutes any proprietary information or records) ("Work Product") belong to Employer, and Executive hereby assigns, and agrees to assign, all Work Product to Employer. Any copyrightable work prepared in whole or in part by Executive in the course of his work for Employer shall be deemed a "work made for hire" under applicable copyright laws, and Employer shall own all rights therein. To the extent that any such copyrightable work is not a "work made for hire", Executive hereby assigns and agrees to assign to Employer all right, title and interest, including, without limitation, copyright in and to such copyrightable work. Executive shall promptly disclose such Work Product and copyrightable work to the Board and perform at Employer's expense all actions reasonably requested by the Board (whether during or after the Employment Period) to establish and confirm Employer's or one of its Subsidiary's or Affiliate's ownership (including, without limitation, assignments, consents, powers of attorney and other instruments).

(e)     Executive understands that Employer has received or will receive from third parties confidential or proprietary information ("Third Party Information") that may be subject to a duty on Employer's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the Employment Period and thereafter, and without in any way limiting the provisions of Section 5(a) above, Executive will hold Third Party Information in a manner consistent with Employer's obligations to the applicable third party.

(f)     Executive will not at any time (whether before, during or after the Employment Period) improperly use or disclose any confidential information or trade secrets, if any, of any former employers of Executive or any other Person to whom Executive has an obligation of confidentiality, and will not bring onto the premises of Employer any unpublished documents or any property belonging to any former employer of Executive or any other Person to whom Executive has an obligation of confidentiality unless consented to in writing by such former employer or Person.

6.     **Non-Competition: Non-Solicitation: Non-Disparagement.**

(a)     During the Employment Period and for a period of twelve (12) months thereafter (the "Restricted Period"), Executive will not, directly or indirectly, (i) enter into, be employed by, engage in, consult, manage or otherwise participate in the operation of any business which competes with the Business within the United States of America (the "Restricted Territory"), (ii) solicit customers, business, patronage or orders for, or sell any products or services in competition with, or for any business that competes with, the Business within the Restricted Territory, (iii) divert, entice or otherwise take away any customers, business, patronage or orders of Employer, or attempt to do so or (iv) promote or assist, financially or otherwise, any person engaged in any business which competes with the Business within the Restricted Territory. Nothing contained in this Section 6(a) will prohibit Executive from acquiring or holding at any one time a passive investment of less than two percent (2%) of the outstanding shares of capital stock of any publicly traded corporation that may compete with Employer within the Restricted Territory.

(b)     During the Restricted Period, Executive will not (other than on behalf of Employer), directly or indirectly (including through another person or entity): (i) recruit or solicit any person who is, or was, during the six (6) month period immediately prior to the date of recruitment or solicitation, an employee of Employer; (ii) induce or influence any Person who is, or was, during the twelve (12) month period immediately prior to the Termination Date, a customer of Employer, to discontinue, modify or reduce its business relationship with Employer; or (iii) make disparaging remarks regarding Employer. The foregoing shall not be violated by general solicitations not specifically directed at the employees or customers of Employer. For purposes of Section 6(a) and 6(b), Employer will also include any Affiliate of Employer.

(c)     If, at the time of enforcement of Section 5 or this Section 6, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law though in no case more extensive than provided by this Agreement. Because Executive's services are unique and because Executive has access to Confidential Information, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement. Therefore, in the event of a breach or threatened breach of this Agreement, Employer or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security).

(d)     Executive acknowledges that the provisions of Section 5 and this Section 6 are in addition to, and not in limitation of, any other confidentiality, non-competition, non-solicitation, non-disparagement or other similar arrangements between Executive and Employer, and in consideration of (i) continued employment with Employer and (ii) additional good and valuable consideration as set forth in this Agreement. In addition, Executive agrees and acknowledges that the restrictions contained in Section 5 and this Section 6 do not preclude Executive from earning a livelihood, nor do they unreasonably impose limitations on Executive's ability to earn a living and that the business of Employer is national in scope and more narrow restrictions are not practical or feasible. Executive agrees and acknowledges that the potential harm to Employer of the non-enforcement of Section 5 or this Section 6 outweighs any potential harm to Executive of its enforcement by injunction or otherwise. Executive acknowledges that Executive has carefully read this Agreement and has given careful consideration to the restraints imposed upon Executive by this Agreement. Executive expressly acknowledges and agrees that each and every restraint imposed by this Agreement is reasonable with respect to subject matter, time period and geographical area.

7.     **Definitions.**

"Affiliate" means, with respect to any Person, any Person that controls, is controlled by or is under common control with such Person or an affiliate of such Person.

"Business" means the business of Employer and each Subsidiary of Employer.

"Cause" means any of the following, as determined by the Board in good faith: (i) the conviction or admission (including a plea of *nolo contendre*) of a felony or the conviction or admission of any other act or omission involving material dishonesty or fraud with respect to Employer or any of its Affiliates; (ii) failure to perform the duties of the office held by Executive as directed by the Board, or any other material breach by Executive of this Agreement and Executive's failure to cure the failure to perform or other material breach within 30 days after the Board gives Executive written notice specifying the alleged failure to perform or breach; (iii) an act of dishonesty, breach of trust or intentional misconduct with respect to Employer or any of its Affiliates; (iv) an act of gross negligence with regard to Employer or any of its Affiliates or any of their respective businesses, assets or employees; or (v) Executive' s refusal or failure, after reasonable direction from Employer, to cooperate in any investigation by Employer or with any investigation, inquiry, hearings or similar proceedings by any governmental authority having jurisdiction over Employer or its Affiliates.

"Centre Lane Funds" means, collectively, Centre Lane Partners III, L.P., CLP 2012, L.P., ZM I CLP III Parallel, LLC, Centre Lane Partners IV, L.P., Centre Lane Partners V, L.P., and Centre Lane Partners V-A, L.P.

"Disability" means the disability of Executive caused by any physical or mental injury, illness or incapacity as a result of which Executive is unable to effectively perform the essential functions of Executive's duties hereunder, with or without reasonable accommodation and after having exhausted all paid or unpaid leave available to Executive under applicable law and the Company's policies, for a continuous period of more than 120 days or for 180 days (whether or not continuous) in any 240-day period, as determined by an independent, legally qualified medical doctor selected by Employer's health or disability insurer.

"Good Reason" means: (i) a reduction of Executive's Annual Base Salary or bonus opportunity, (ii) any material reduction of Executive's employee benefits, unless such reduction is in connection with a general reduction of benefits, (iii) Employer's material breach of this Agreement; (iv) a material diminution or change in Executive's title, authority, duties or responsibilities as set forth in Section 2; (v) a requirement that Executive report to anyone other than the Board; or (vi) a requirement that Executive report to an office more than twenty-five (25) miles from its then current location; *provided* that, prior to terminating employment for Good Reason, Executive must provide written notice to Employer within 30 days after the change is made to the terms or condition(s) of employment or other event or condition constituting Good Reason and must provide Employer 30 days to remedy such change or other event or condition (the "Cure Period"), and Employer must have failed to remedy such action within the Cure Period and Executive must have actually terminated such employment within 30 days following the expiration of the Cure Period.

"Liquidation Event" means any voluntary or involuntary liquidation, dissolution or winding up of the Company or upon the consummation of any Sale of the Company.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization,

investment fund, any other business entity and a governmental entity or any department, agency or political subdivision thereof.

"Sale of the Company" means (a) any consolidation, merger or recapitalization of the Company, or any sale, exchange, conveyance or other disposition of equity interests of the Company in a single transaction or a series of transactions, in which the equity holders of the Company immediately prior to such consolidation, merger, recapitalization, sale, transaction or first of such series of transactions, own less than fifty percent (50%) of the Company's or any successor entity's issued and outstanding equity interests immediately after such consolidation, merger, recapitalization, sale, transaction or series of such transactions; or (b) any sale, lease or other disposition of all or substantially all of the assets of the Company and its Subsidiaries on a consolidated basis.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other direct or indirect subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more direct or indirect subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of Employer.

8.      **Notices**. Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested) or sent by facsimile or electronic mail to recipient (with a hard copy sent by reputable overnight courier service (charges prepaid) that same day if telecopied or emailed before 5:00 P.M. New York City time on a business day or otherwise on the next business day) or sent by reputable overnight courier service (charges prepaid) to the recipient at the address below indicated:

If to Employer:

Keeco, LLC
c/o Centre Lane Partners, LLC
One Grand Central Place
60 East 42nd St., Suite 2220
New York, NY 10165
Attn: Mayank Singh
Email: msingh@centrelanepartners.com


with a copy to:

(which shall not constitute notice to Employer)

Thompson Hine LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114
Attn: Curtis Tuggle
Email: Curtis.Tuggle@ThompsonHine.com


If to Executive: the address of Executive most recently provided to Employer, with a copy to (which shall not constitute notice to Executive):

Katten Muchin Rosenman LLP
2121 N. Pearl Street, Suite 1100
Dallas, TX 75201
Attn: Victor B. Zanetti
Email: vic.zanetti@katten.com


or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice (in accordance with this <u>Section 8</u>) to the sending party. Any notice under this Agreement will be deemed to have been given when so delivered or sent or, if mailed, five days after deposit in the U.S. mail.

9.    **General Provisions.**

(a)    <u>Protected Rights</u>. Nothing contained in this Agreement is intended to or shall limit Executive's ability to respond to a lawful subpoena or communicate or cooperate with any government agency (which shall include the ability to participate in an investigation or provide documents or other information to a government agency with relevant jurisdiction); or comply with any other legal obligation. Pursuant to 18 USC§ 1833(b), an individual may not be held criminally or civilly liable under any federal or state trade secret law for disclosure of a trade secret: (i) made in confidence to a government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; and/or

(ii) made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Additionally, an individual suing an employer for retaliation based on the reporting of a suspected violation of law may disclose a trade secret to his or her attorney and use the trade secret information in the court proceeding, so long as any document containing the trade secret is filed under seal and the individual does not disclose the trade secret except pursuant to court order.

(b)    <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties hereto agree to renegotiate such provision in good faith. In the event that such parties cannot reach a mutually agreeable and enforceable replacement for such provision, then: (i) such provision shall be excluded from this Agreement; (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded; and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(c)    <u>Complete Agreement</u>. This Agreement and any documents expressly referred to herein embody the complete agreement and understanding between the parties hereto and supersede and preempt any other prior understandings, agreements (employment or otherwise) or representations by or between such parties, written or oral, which may have related to the subject matter hereof in any way.

(d)    <u>Counterparts</u>. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

(e)    <u>Successors and Assigns</u>. Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by Executive, Employer and their respective successors and assigns, except that Executive may not assign his rights or delegate his duties or obligations hereunder without the prior written consent of Employer.  For the avoidance of doubt, Employer may assign this Agreement and Executive's employment to its Affiliates, successors and assigns, and Executive expressly consents to such assignment.

(f)    <u>Choice of Law</u>. This Agreement shall be governed, construed, interpreted and enforced in accordance with the substantive laws of the State of New York, without regard to conflict of laws principles. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in a state or federal court located in New York City, New York. The parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

(g)    <u>Remedies</u>. Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party hereto may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance

and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

(h) <u>Amendment and Waiver</u>. The provisions of this Agreement may be amended and waived only with the prior written consent of Employer (through its Board) and Executive.

(i) <u>Insurance</u>. Employer, in its discretion, may apply for and procure in its own name and for its own benefit life and/or disability insurance on Executive in any amount or amounts considered available. Executive agrees to cooperate, at the sole expense of Employer, in any medical or other examination, supply any information and execute and deliver any applications or other instruments in writing as may be reasonably necessary to obtain and constitute such insurance or, in the event Executive is disabled, with respect to obtaining a determination from an independent, legally qualified medical doctor of whether Executive's condition constitutes a Disability.

(j) <u>Executive's Cooperation</u>. During the Employment Period and thereafter, Executive shall, at Employer's sole expense, cooperate with Employer in any disputes with third parties, internal investigation or administrative, regulatory or judicial proceeding as reasonably requested by Employer (including, without limitation, Executive being available to Employer upon reasonable notice for interviews and factual investigations, appearing at Employer's request to give testimony without requiring service of a subpoena or other legal process, volunteering to Employer all pertinent information and turning over to Employer all relevant documents which are in or may come into Executive's possession, all at times and on schedules that are reasonably consistent with Executive's other permitted activities and commitments). If, after the expiration of the Employment Period, Employer seeks to elicit Executive's cooperation pursuant to this paragraph, Executive shall be reimbursed for all reasonable expenses incurred on behalf of, or for the benefit of, Employer.

(k) <u>Business Days</u>. If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or holiday in the state in which Employer's chief executive office is located, the time period shall be automatically extended to the business day immediately following such Saturday, Sunday or holiday.

(l) <u>Taxes</u>. Employer shall be entitled to deduct or withhold from any amounts owing from Employer or any of its Subsidiaries to Executive any federal, state, local or foreign withholding taxes, excise taxes or employment taxes ("<u>Taxes</u>") imposed upon Executive and required to be so withheld by Employer, with respect to Executive's compensation or other payments from Employer, including, without limitation, wages and bonuses.

(m) <u>Termination</u>. This Agreement (except for the provisions of <u>Sections 1</u>, <u>2</u>, and <u>3</u>) shall survive a termination or expiration of the Employment Period and shall remain in full force and effect after the Employment Period.

(n) <u>Corporate Opportunity</u>. During the Employment Period, Executive shall submit to the Board all business, commercial and investment opportunities or offers presented to Executive or of which Executive becomes aware which relate to the business of Employer, at any time during

the Employment Period ("Corporate Opportunities"). During the Employment Period, unless approved by the Board, Executive shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Executive's own behalf.

(o)    No Strict Construction. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

(p)    Delivery by Facsimile or PDF. This Agreement, the agreements referred to herein and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic transmission in pdf, shall be treated in all manners and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other applicable parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic transmission in pdf to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission in pdf as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(q)    Source of Funds. This Agreement constitutes an unfunded, unsecured obligation of the Company, and any payments made hereunder shall be made solely from the general assets of the Company.

(r)    Conditions. Notwithstanding anything set forth herein to the contrary, Executive's commencement of, and continued, employment with, the Company is contingent upon: (a) verification of Executive's right to work in the United States, as demonstrated by Executive's completion of the I-9 form upon hire and Executive's submission of acceptable documentation (as noted on the I-9 form) verifying Executive's identity and work authorization within 3 calendar days after starting employment; and (b) satisfactory verification of background investigations. Executive's employment may be immediately terminated by Employer if any of the above conditions are not satisfied, with any such termination to be treated as a termination by Employer for "Cause" hereunder.

**10.    Indemnification.** The Company hereby agrees to indemnify Executive and hold him harmless to the fullest extent permitted by applicable law against and in respect of any and all actions, suits, proceedings, claims, demands, judgments, costs, expenses (including, without limitation, reasonable attorney's fees), losses and damages resulting from or arising out of Executive being or having been an officer, director or employee of the Company or any of its Subsidiaries or Affiliates. This provision shall survive the termination of this Agreement and is in addition to any other rights of indemnification Executive may have.

(Signature page follows)

15

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

**EMPLOYER**

Keeco, LLC

By: DocuSigned by: Mayank Singh EFAAB7E74E72440...

Name: Mayank Singh

Its: President

**EXECUTIVE**

______________________________

Christopher Grassi

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

**EMPLOYER**

Keeco, LLC

By: _____

Name:

Its:


**EXECUTIVE**

*Christopher Grassi*
_____

Christopher Grassi

**Exhibit A**
**GENERAL RELEASE**

This General Release (this "<u>Release</u>") is made and entered into as of this _____ day of _____, 20___, by and between Keeco, LLC ("<u>Employer</u>") and Chris Grassi ("<u>Executive</u>"). In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employer and Executive, intending to be legally bound, hereto agree as follows:

**1.     Employment Status**. Executive's employment with Employer and its affiliates terminated effective as of _____, 20___ (the "<u>Separation Date</u>").

**2.     Payments and Benefits**. Upon the effectiveness of the terms set forth herein, Employer shall provide Executive with the benefits set forth in Section 4(b) of the Employment Agreement between Executive and Employer dated as of September ___, 2022 (the "<u>Employment Agreement</u>"), upon the terms, and subject to the conditions, of the Employment Agreement. Executive agrees that Executive is not entitled to receive any additional payments as wages, vacation or bonuses except as otherwise provided under Section 4(b) of the Employment Agreement.

**3.     No Liability**. This Release does not constitute an admission by Employer, or any of its parents, subsidiaries, affiliates, divisions, officers, directors, partners, agents, or employees, or by Executive, of any unlawful acts or of any violation of federal, state or local laws.

**4.     General Release and Waiver of Claims**. In consideration of the payments and benefits set forth in <u>Section 2</u> of this Release, Executive for himself, his heirs, administrators, representatives, executors, successors and assigns does hereby irrevocably and unconditionally release, acquit and forever discharge Employer and each of its parents, subsidiaries, affiliates, divisions, successors, and assigns, and each of their respective officers, directors, partners, agents, attorneys, insurers, administrators, and former and current employees, including without limitation all persons acting by, through, under or in concert with any of them (collectively, "<u>Releasees</u>"), and each of them, from any and all claims, demands, actions, causes of action, costs, attorney fees, and all liability whatsoever, whether known or unknown, fixed or contingent, which Executive has, had, or may ever have against the Releasees relating to or arising out of Executive's employment or separation from employment with Employer, from the beginning of time and up to and including the date Executive executes this Release. This Release includes, without limitation, (i) law or equity claims; (ii) tort or contract (express or implied) claims, including Executive's claims against Employer under any part of the Employment Agreement other than Section 4; (iii) claims for wrongful discharge, retaliatory discharge, whistle blowing, libel, slander, defamation, unpaid compensation, intentional infliction of emotional distress, fraud, public policy, contract or tort, and implied covenant of good faith and fair dealing; (iv) claims arising under any federal, state, or local laws of any jurisdiction that prohibit age, sex, race, national origin, color, disability, religion, veteran, military status, sexual orientation, or any other form of discrimination, harassment, or retaliation (including without limitation under the Age Discrimination in Employment Act of 1967 as amended by the Older Workers Benefit Protection Act ("<u>ADEA</u>"), the National Labor Relations Act, Executive Order 11246, the Employee Retirement Income Security Act of 1974, the Worker Adjustment and Retraining Notification Act, Title VII of the

Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991, Section 1981 of the Civil Rights Act of 1966, the Equal Pay Act of 1962, the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, the Family and Medical Leave Act of 1993, the Consolidated Omnibus Budget Reconciliation Act (COBRA), the Genetic Information Non-discrimination Act, the Sarbanes-Oxley Act, the Employee Polygraph Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Equal Pay Act, the Lilly Ledbetter Fair Pay Act, the Post-Civil War Civil Rights Act (42 U.S.C. §§1981-1988), the New York State Human Rights Law, the New York Retaliatory Action by Employers Law, Article 6 of the New York Labor Law, the New York Nondiscrimination for Legal Actions Law, Article 4 of the New York Civil Rights Law, and the New York Wage Payment Law, as well as any claims under local statutes and ordinances that may be legally waived and released, (v) claims arising under the Employee Retirement Income Security Act (excluding claims for amounts that are vested benefits or that Executive is otherwise entitled to receive under any employee benefit plan of Employer or any of its affiliates in accordance with the terms of such plan and applicable law), and (vi) any other statutory or common law claims related to Executive's employment with Employer or the separation of Executive's employment with Employer.

However, this Release excludes, and Executive does not waive, release, or discharge (A) any right to file an administrative charge or complaint with, or testify, assist, or participate in an investigation, hearing, or proceeding conducted by, the Equal Employment Opportunity Commission, or other similar federal or state administrative agencies (although Executive waives any right to monetary relief related to any filed charge or administrative complaint); (B) any right to report allegations of unlawful conduct, including criminal conduct and unlawful employment practices, to federal, state, or local authorities; and (C) any right to make claims under the New York Workers' Compensation Law, the New York Unemployment Insurance Law, any other claims that cannot be waived by law; (D) indemnification rights Executive has against Employer; and (E) any rights to vested benefits, such as pension or retirement benefits, the rights to which are governed by the terms of the applicable plan documents and award agreements.

Without limiting the foregoing Section, Executive represents that Executive understands that this Release specifically releases and waives any claims of age discrimination, known or unknown, that Executive may have against the Releasees as of the date Executive signs this Release. This Release specifically includes a waiver of rights and claims under the Age Discrimination in Employment Act of 1967, as amended, and the Older Workers Benefit Protection Act. Executive acknowledges that as of the date Executive signs this Release, Executive may have certain rights or claims under the Age Discrimination in Employment Act, 29 U.S.C. § 626 and Executive voluntarily relinquishes any such rights or claims by signing this Release.

**5.    Bar**. Executive acknowledges and agrees that he should hereafter make any claim or demand or commence or threaten to commence any action, claim or proceeding against any Releasee with respect to any cause, matter or thing which is the subject of the releases under Section 4 of this Release, this Release may be raised as a complete bar to any such action, claim or proceeding, and the applicable Releasee may recover from the other party all costs incurred in connection with such action, claim or proceeding, including attorneys' fees.

**6.    Governing Law**. This Release shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles. Any action

or proceeding by either of the parties to enforce this Release shall be brought only in a state or federal court located in the State of New York. The parties hereby irrevocably submit to the non-exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

7.    **Specific Release of ADEA Claims**. In further consideration of the payments and benefits provided to Executive in this Release, Executive hereby irrevocably and unconditionally fully and forever waive, release, and discharge the Releasees from any and all claims, whether known or unknown, from the beginning of time through the date of Executive's execution of this Release arising under the ADEA, as amended, and its implementing regulations. By signing this Release, Executive hereby acknowledges and confirms that:

(a)    Executive has read this Release in its entirety and understands all of its terms;

(b)    by this Release, Executive has been advised in writing to consult with an attorney of Executive's choosing and has consulted with such counsel as Executive believed was necessary before signing this Release;

(c)    Executive knowingly, freely, and voluntarily agrees to all of the terms and conditions set out in this Release including, without limitation, the waiver, release, and covenants contained in it;

(d)    Executive is signing this Release, including the waiver and release, in exchange for good and valuable consideration in addition to anything of value to which Executive is otherwise entitled;

(e)    Executive was given at least 21 calendar days to consider the terms of this Release and consult with an attorney of Executive's choice, although Executive may sign it sooner if desired, and changes to this Release, whether material or immaterial, do not restart the running of the 21-day period;

(f)    Executive understands that Executive has 7 calendar days after signing this Release to revoke the release in this paragraph by delivering notice of revocation to Employer in accordance with Section 8 of the Employment Agreement before the end of this 7-day period; and

(g)    Executive understands that the release contained in this Section does not apply to rights and claims that may arise after Executive signs this Release.

Executive acknowledges and agrees that the payments and benefits provided under Section 2 of this Release represent substantial value over and above that to which Executive would otherwise be entitled.

8.    **Revocation**. Executive has a period of 7 calendar days following the execution of this Release during which Executive may revoke this Release by delivering written notice to Employer (in accordance with Section 8 of the Employment Agreement), and this Release shall not become effective or enforceable until such revocation period has expired. Executive understands that if he revokes this Release, it will be null and void in its entirety, and he will not

be entitled to any payments or benefits provided in this Release, including without limitation those under <u>Section 2</u> of this Release.

9.      **Miscellaneous**. This Release is the complete understanding between Executive and Employer in respect of the subject matter of this Release and supersedes all prior agreements relating to the same subject matter. Executive has not relied upon any representations, promises or agreements of any kind except those set forth herein in signing this Release. In the event that any provision of this Release should be held to be invalid or unenforceable, each and all of the other provisions of this Release shall remain in full force and effect. If any provision of this Release is found to be invalid or unenforceable, such provision shall be modified as necessary to permit this Release to be upheld and enforced to the maximum extent permitted by law.

10.     **Counterparts**. This Release may be executed by the parties hereto in counterparts, which taken together shall be deemed one original.

**KEECO, LLC**

*[Form of release – Do not sign]*

_____
By:
Its:

**EXECUTIVE**

*[Form of release – Do not sign]*

_____
Chris Grassi